IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

REGINA LAWSON,

        Plaintiff,               No. CIV S-08-2008 GGH

    vs.

MICHAEL J. ASTRUE,          ORDER
Commissioner of
Social Security,

        Defendant.

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social

Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI")

and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social

Security Act ("Act").  For the reasons that follow, Plaintiff's Motion for Summary Judgment is

DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the

Clerk is directed to enter judgment for the Commissioner.

BACKGROUND

        Plaintiff, born February 24, 1964, applied on October 18, 2002 for disability

benefits.  (Tr. at 485-86.)  Plaintiff alleged she was unable to work due to asthma, back and neck

pain, arthritis, stomach ulcers, and ovarian cysts.  (Id. at 529, 539, 29.)  Plaintiff was initially

denied disability benefits by ALJ Mark C. Ramsey on May 17, 2004. She then filed subsequent

applications for DIB and SSI in November, 2004, which were awarded on April 1, 2005 with a

finding of disability as of June 18, 2004. The Appeals Council then reopened this favorable

determination, vacated the ALJ's decision in regard to the first set of applications, consolidated

the claims and remanded the case for further proceedings on the entire period from the alleged

onset date of September 16, 2002 to the present, based on substantive defects and for further

development of the record. (Id. at 26, 465-68.)

After remand, in a decision dated December 19, 2006, ALJ Mark C. Ramsey

determined plaintiff was not disabled based on her applications filed October 18, 2002.[1] (Tr. at

38.) The ALJ made the following findings:[2]

---

[1] On appeal from this decision, the Appeals Council adopted the ALJ's findings, and clarified that plaintiff was not eligible for benefits based on both the applications filed in October, 2002 and November, 2004. (Tr. at 12-15.)

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

    Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

    Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

    Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

    Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.

    Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

2.   The claimant has not engaged in substantial gainful activity since September 16, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*, 416.920(b) and 416.971 *et seq*.)

3.   The claimant has the following severe impairments: asthma, chronic obstructive pulmonary disease, allergies, cervical strain, lumbar strain, bilateral carpal tunnel syndrome, hypothyroidism, migraine headaches, history of ovarian cysts and abdominal adhesions, major depression, borderline intellectual functioning or cognitive disorder, an anxiety disorder, and obsessive-compulsive disorder.

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, unskilled work that does not involve working with others on joint tasks (teamwork). The claimant is limited to lifting 20 pounds occasionally and 10 pounds frequently. There are no standing, walking, sitting, postural or manipulative limitations. She is unable to perform jobs involving concentrated exposure to dust o[r] fumes. [Alternative findings incorporating many of the limitations assessed by Dr. Sheikh are provided in #10 below.]

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on February 24, 1964 and is currently 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

---

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. <u>Bowen</u>, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. <u>Id</u>

<table>
<tr><td>1</td><td>9.</td><td>Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).</td></tr>
</table>

<div style="margin-left:2em">

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.   The claimant has not been under a "disability," as defined in the Social Security Act, from September 16, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

</div>

(Tr. at 26-38.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ Failed to Properly Evaluate Whether Ms. Lawson's Mental Impairment Met or Equaled the Requirements of Listing 12.05C; B. Whether the ALJ Failed to Properly Evaluate and Credit the Opinions of Plaintiff's Treating Physicians Without a Legitimate Basis; C. Whether the ALJ Failed to Credit Plaintiff's Testimony Regarding Her Pain and Functional Limitations; and D. Whether the ALJ Failed to Properly Assess Plaintiff's RFC and as a Result Failed to Properly Question the Vocational Expert.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ

1  is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

2  ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

3  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

4  rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

5  ANALYSIS

6      A. Listing 12.05C

7          Plaintiff contends that she meets or equals Listing 12.05C. The ALJ determined

8  in finding no. 4 of the decision that plaintiff's impairments did not meet or equal an impairment

9  listed in the Regulations' "Listing of Impairments" ("Listings"), which lists impairments to

10 thirteen categories of body systems which are severe enough to preclude any gainful activity.

11 Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. § 404.1520(d). When all the

12 requirements of a listing are met, the described condition is irrebuttably presumed disabling.

13 Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir. 1985); 20 C.F.R. § 404.1520(d).

14          At the third step of the disability analysis, the ALJ determines whether a person's

15 condition either "meets" or "equals" a listing. A mere *diagnosis* of a listed impairment is not

16 sufficient. Specific findings included in each listing also must be met. See, e.g., Key v. Heckler,

17 754 F.2d 1545, 1550 (9th Cir. 1985). Alternatively, other diagnostic tests, or the combined

18 effects of various conditions, may demonstrate the "equivalent" of the specific required findings.

19 See, e.g., Sullivan v. Zebley, 493 U.S. 521, 531 (1990); Marcia v. Sullivan, 900 F.2d 172 (1990).

20 In sum, however, unless an impairment is as severe as and has lasted as long as described in the

21 listing, a person is not presumptively disabled. Young, 911 F.2d at 183.

22          Listing 12.05 provides in part:

23          Mental retardation refers to significantly subaverage general
            intellectual functioning with deficits in adaptive functioning
24          initially manifested during the developmental period; i.e., the
            evidence demonstrates or supports onset of the impairment before

25

26

5

age 22.[3]

> The required level of severity for this disorder is met when the requirements in A, B, C, **or** D are satisfied.
> ...
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work- related limitation of function;
> ...

20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05(c).  (emphasis added).

"An impairment imposes a significant work-related limitation of function when its effect on a claimant's ability to perform basic work activities is more than slight or minimal." Fanning v. Bowen, 827 F.2d 631, 633 (9th Cir. 1987).  This, in other words, is the definition of a "severe" impairment.  Thus, in this circuit, a person who has a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function, meets the second prong of the §12.05C listing.  Id.; see also Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997); Edwards v. Heckler, 736 F.2d 625, 629-31 (11th Cir.1984); Nieves v. Secretary of Health & Human Servs., 775 F.2d 12, 14 & n. 7 (1st Cir.1985)).  Indeed, in footnote 3 of the Fanning decision, the court found that the "extra" impairment need not even reach the "severe" limit; although one might be hard pressed to call a less than "severe" impairment, an impairment at all.

In Fanning, the first prong of the listing was met because plaintiff's IQ was found to be between 76 and 69.  Fanning, 827 F.2d at 633.  The court imposed a standard applicable to the second prong, that the impairment must have more than a slight or minimal effect on plaintiff's ability to perform basic work activities.  Id.  Because the ALJ had not considered this question in regard to the plaintiff's knee injury, the court remanded the matter.  Id.

In the instant case, the ALJ found plaintiff to have the severe impairment of borderline intellectual functioning.  (Tr. at 29.)  In making this finding, the ALJ found that

---

[3]  Indeed, in the DSM-IV, in order to be considered mentally retarded, one must exhibit this retardation prior to age 18.  DSM IV-TR at 41.

plaintiff's IQ scores were in the 60s. (Id.) The record supports a finding that plaintiff met this first prong of subsection (C) of the listing.

The ALJ refused to find, however, that plaintiff's onset occurred prior to age 22. He stated:

> She indicated that she had not been in special education until she was in college. She worked as a pre-school teacher. She has been able to obtain a driver's license. At the hearing, Dr. Walter testified that the record did not establish that the claimant had developmental mental retardation manifested before age 22. This conclusion is supported by the record as a whole.

(Tr. at 29.)

Plaintiff urges for remand based on compelling evidence that plaintiff's IQ predated age 22. Most of what plaintiff refers to as evidence, however, is her own testimony as follows. Her third grade teacher recommended special education but her father refused to approve. She received much individual attention and tutoring in seventh and eighth grades. She failed the driving test six or more times before she finally got her driver's license at age 30. She testified that she was tested at junior college and a learning disability was found. (Tr. at 1600-1602.) She states that she quit junior college due to health problems but on further questioning, testified that her transcript reflected that she was academically dismissed because she had "incompletes" in her classes. (Id. at 1602-1603.)

Plaintiff concedes she has no school records other than one page from elementary school in 1971 which states, "psychological testing," (Tr. at 597), and her college transcript which indicates a variety of grades, including an A, Cs, Ds, Fs and incomplete courses. (Id. at 595-96.) There is no record of testing in junior college or a learning disability other than plaintiff's own testimony. Plaintiff testified that she earned 18 units at Sacramento City College. (Id. at 1560.)

Plaintiff was able to hold a job for nine years from 1993 to 2002, starting at around the age of 29, as a teacher's aide, despite this level of intellectual functioning. (Id. at

530.) Plaintiff herself described her job duties as preparing a lesson plan, preparing snacks and meals, and preparing activities such as physical play, art, and music. (Id.)

Furthermore, there may have been an intervening event causing a change in plaintiff's intellectual functioning. She testified that she was in a car accident in her 20s, probably at age 22 to 24, wherein she hit her head against the dashboard and the glass. (Tr. at 1625.) The medical practitioners disagree over whether this accident caused brain damage sufficient to reduce plaintiff's intellectual functioning. Dr. Nakagawa, a psychologist, opined on March 11, 2005, that "screening measures suggest brain damage." (Id. at 990.) Another psychologist, Dr. Miller, stated, "she certainly tests as having likely brain damage and there is a history of head trauma." (Id. at 1453.) Both psychologists were presumably referring to her car accident as plaintiff related no other trauma to her head. Dr. Walter, the testifying medical expert, was much more equivocal in his testimony. After reviewing all of the medical records, he testified that IQ normally improves with age, that there was no medical evidence of head trauma based on a normal brain scan and exam after the accident, but that any statement of her actual IQ prior to age 22 would only be a "guesstimate."[4] (Id. at 1624, 1627.) Since there are no medical records from the car accident that occurred in the 1980s, it is impossible to draw a conclusion from these conflicting opinions.

Although other circuits have found a rebuttable presumption that a plaintiff's IQ prior to age 22 was the same as his current IQ, the Ninth Circuit has not decided this issue, nor has it expressed what criteria would satisfy this age requirement. Walberg v. Astrue, 2009 WL 1763295 (W.D. Wash. 2009) (citing cases). In any event, those circuits permitting such a rebuttable presumption only apply it where there are no intervening circumstances which might possibly have affected an IQ. Branham v. Heckler, 775 F.2d 1271, 1274 (4th Cir. 1985) (rebuttable presumption absent contrary evidence); Muncy v. Apfel, 247 F.3d 728, 734 (9th Cir.

---

[4] A recent CT scan of the brain on September 23, 2002, was normal. (Tr. at 679.)

2001) (rebuttable presumption unless change in intellectual functioning).

The only evidence to support plaintiff's claim that she suffered from developmental mental retardation prior to age 22 is her own testimony and statements to medical professionals. Although lay evidence may be permissible, the date alleged by the plaintiff should be used only when consistent with other available evidence. Social Security Ruling 83-20. "The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record." (Id.) The fact that plaintiff may have been recommended for a special education program in elementary school or found to have a learning disability in college does not automatically lead to the conclusion that it was due to borderline intellectual functioning. Furthermore, reliance solely on a claimant's statements without corroboration creates the potential for abuse, especially in this case where the ALJ found plaintiff's statements regarding her physical functioning could not be fully credited. (Tr. at 32.)

At the time plaintiff made these statements, she was represented by counsel and her attorney had the opportunity to submit evidence of mental retardation prior to age 22. Counsel failed to do so. Plaintiff has still not submitted any evidence of onset date, such as school records, report cards, or psychologist's reports for that time period. Plaintiff, however, was able to obtain a high school diploma without special education classes, completed 18 units at junior college, and was able to hold a job as a preschool teacher's aide for nine years. See Payne v. Astrue, 2010 WL 654319, *11 (D. Ariz. Feb. 23, 2010) (considering such factors). Without evidence of onset prior to age 22, listing 12.05 can not be satisfied.

However, although plaintiff places all her "eggs" in the 12.05 mental retardation basket, in all fairness, a complementary listing should be reviewed as well to see if plaintiff "equaled" that listing. The ALJ considered alternative listings, including the most pertinent listing 12.02 – organic mental disorders. In the real world, it would not matter much whether a retardation is pre or post-22 years of age; if one cannot work because of a retardation caused by brain injury, that inability exists regardless of age. In relevant part, Listing 12.02 is met if:

A. Demonstration of a loss of specific cognitive abilities... and persistence of at least one of the following

    1. ....

    2. Memory impairment, either short term ( inability to learn new information)...

               ****

    7. Loss of measure intellectual ability of at least 15 IQ points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing...

And

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence or pace; or

    4. Repeated periods of decompensation, each of extended duration.[5]

Whatever the meaning of neuropsychologial testing, parity would require that the retardation levels of Listing 12.05 be utilized herein. The court has scrutinized the testing in Dr. Miller's report and that of Dr. Nakagawa. In the former, Dr. Miller did conclude that plaintiff's IQ was in the high 60s. He equated her cognitive abilities to be within the "1st percentile in overall cognitive functioning relative to her age group." (Tr. 1449). This is not good. He also noted an impaired short term memory, "extremely low" (Tr. 1451). However, Dr. Miller, while finding the results "generally valid" (Tr. 1453) also thought that plaintiff "at times, did not appear to give the testing tasks her full effort." (Tr. 1445). He also noted significant inconsistencies with the testing results – her grades while in school, her high school diploma and college classes, her relatively successful employment over the years – even after accidents and other trauma. As Dr. Miller thought: "This [consistent] history is difficult to imagine given her very low cognitive and memory scores from today's testing." (Tr. 1453). He also noted that she would have much difficulty in managing her funds as seen from the testing, but that "[h]owever, she has apparently been handling her family's finances without difficulty." (Tr. 1454). The inference to be drawn is that plaintiff did not test (purposefully or otherwise) at the level of her

---

[5] The last category "C" is inapplicable as plaintiff has exhibited no periods of decompensation or an inability to function outside of a highly supportive living arrangement.

actual functioning.  In any event, "[i]f her job responsibilities were limited to very simple and routine task[s] with close supervision available, someone with an IQ of 66 could perform adequately."  (Tr. 1453.)

Dr. Nakagawa's testing in 2005, Tr. 987-991 revealed similar cognitive deficiencies as found by Dr. Miller, including short term memory (learning) deficits. The doctor also opined: "She probably will have difficulty maintaining pace, persistence, attention, and concentration.  While she can understand and carry out simple job instructions, the depression and cognitive problems would likely negatively impact her ability to deal with co-workers, supervisors and the public."  (Tr. 990).  This latter observation, however, was somewhat rebutted by plaintiff's 2001 rendition of her activities where she related very adequate social abilities.  (Tr. 1447).

The undersigned would find that plaintiff met two of the "A" criteria, i.e., severe cognitive impairments and a severe learning disability occasioned by her memory.  However, even giving plaintiff the benefit of the doubt on finding marked difficulties in maintaining concentration persistence or pace, see also (Tr. 1620), plaintiff must satisfy another of the "B" criteria, and she does not.  The record does not support: 1- *marked* restriction of activities of daily living; or 2- *marked* difficulties in maintaining social functioning; or 4- repeated periods of decompensation, each of extended duration.

Although the matter is close, under the deferential standard of review of an ALJ's decision, plaintiff cannot meet a listing herein.

B.  Whether the ALJ Improperly Rejected the Opinions of the Treating Physicians

Plaintiff contends that the ALJ improperly rejected the treating opinions of Drs. Sheikh and Marino.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

\\\\\

F.3d 1195, 1201 (9th Cir. 2001); <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995).[6]  Ordinarily,

more weight is given to the opinion of a treating professional, who has a greater opportunity to

know and observe the patient as an individual.  <u>Id.</u>; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th

Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to

considering its source, the court considers whether (1) contradictory opinions are in the record;

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a

treating or examining medical professional only for *"clear and convincing"* reasons.  <u>Lester</u> , 81

F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be

rejected for *"specific and legitimate"* reasons.  <u>Lester</u>, 81 F.3d at 830.  While a treating

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

<u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

weigh the contradicted treating physician opinion, <u>Edlund v. Massanari</u>, 253 F.3d 1152 (9th Cir.

2001),[7] except that the ALJ in any event need not give it any weight if it is conclusory and

supported by minimal clinical findings.  <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir.1999)

(treating physician's conclusory, minimally supported opinion rejected); <u>see also</u> <u>Magallanes</u>,

881 F.2d at 751. The opinion of a non-examining professional, without other evidence, is

---

[6]  The regulations differentiate between opinions from "acceptable medical sources" and
"other sources."  <u>See</u> 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed
psychologists are considered "acceptable medical sources," and social workers are considered
"other sources."  <u>Id.</u>  Medical opinions from "acceptable medical sources," have the same status
when assessing weight.  <u>See</u> 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific
regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
accordingly are given less weight than opinions from "acceptable medical sources."

[7]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
(5) consistency; (6) specialization. 20 C.F.R. § 404.1527

insufficient to reject the opinion of a treating or examining professional.  <u>Lester</u>, 81 F.3d at 831.

In regard to Dr. Sheikh, the ALJ did not fully credit this treating neurologist because his assessed limitations in standing, walking and lifting were "somewhat inconsistent with the level of treatment he has provided."  (Tr. at 34.)  He explained in his opinion:

> Although he has found significant clinical findings, he suggested that some of the weakness may be transient.  He provided only wrist braces for the carpal tunnel syndrome, and there is no indication that surgery was being considered.  He also assessed no manipulative limitations.  The claimant has not been referred to a neurosurgeon or orthopedist for surgical considerations regarding radiculopathy.  She has not been sent to a pain clinic.  There is only a brief period of physical therapy, but that does not appear to be related to her most recent symptoms.  In addition, his opinion that she could not work a full eight-hour day is inconsistent with his assessment of the number of hours she can sit, stand and walk.

(<u>Id.</u>)  The aforementioned reasons were sufficient to partially reject Dr. Sheikh.

The ALJ nevertheless stated that he was incorporating Dr. Sheikh's restrictions in regard to sitting, standing, walking and lifting in his alternative findings.  (<u>Id.</u>; tr. 36, finding no. 10.)  These alternative findings were based upon his second hypothetical which incorporated most of Dr. Sheikh's physical limitations, including walking and standing for two to three hours per day, sitting six hours per day, changing positions, and lifting five to ten pounds occasionally.[8]  (Tr. at 1634, 37.)  Based upon this hypothetical, the vocational expert testified to three sedentary jobs plaintiff could do, in addition to the three jobs found to be responsive to the first

---

[8]  Dr. Sheikh supported his lifting limitation with a nerve conduction study which was conducted in regard to plaintiff's carpal tunnel syndrome.  (Tr. at 1472, 1365-66.)  Any argument that plaintiff could not lift ten to twenty pounds is incongruous as carpal tunnel syndrome is caused by compression of a main nerve in the wrist due to repetitive movements.  <u>Www.ninds.nih.gov.</u>  Although the ability to grasp objects or perform manual tasks might be affected, the ability to lift and carry should not be limited by this disorder.  Exertional capabilities are the "primary strength activities" of sitting, standing, walking, lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (2009); SSR 83-10, Glossary; <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).  Non-exertional activities include mental, sensory, postural, manipulative and environmental matters which do not directly affect the primary strength activities. 20 C.F.R. § 416.969a (c) (2009); SSR 83-10, Glossary; <u>Cooper</u>, 880 F.2d at 1156 n. 7 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e)).

Furthermore, plaintiff's carpal tunnel syndrome was found to be only moderate and surgery was not recommended.  (Tr. at 1365-66.)

1  hypothetical.  (Id.)

2       The ALJ did not incorporate Dr. Sheikh's restriction in bending and stooping, or

3  need for rest periods during the day, and rejected Dr. Sheikh's opinion that plaintiff could not

4  work eight hours per day for five days per week due to her pain.  The ALJ was correct in that

5  these limitations were not supported by the record.  Furthermore, an ALJ may properly rely upon

6  only selected portions of a medical opinion while rejecting other parts.  See, e.g., Magallanes v.

7  Bowen, 881 F.2d 747, 753 (9th Cir. 1989) (ALJ's supported reliance on selected portions of

8  conflicting opinion constitutes substantial evidence).  However, such selective reliance must be

9  consistent with the medical record as a whole.  See, e.g., Edlund v. Massanari, 253 F.3d 1152,

10  1159 (9th Cir. 2001) (ALJ cannot reject portion of medical report that is clearly reliable).

11       Moreover, "An ALJ may reject a treating physician's opinion if it is based 'to a

12  large extent' on a claimant's self-reports that have been properly discounted as incredible."

13  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Morgan v. Comm'r Soc. Sec.

14  Admin., 169 F.3d 595, 602 (9th Cir. 1999)).  Furthermore, "the ALJ is the final arbiter with

15  respect to resolving ambiguities in the medical evidence."  Id.

16      Historically, the courts have recognized conflicting medical
    evidence, the absence of regular medical treatment during the

17      alleged period of disability, and the lack of medical support for a
    doctor's report based substantially on a claimant's subjective

18      complaints as specific, legitimate reasons for disregarding the
    treating physician's opinion. Flaten, 44 F.3d at 1463-64; Fair v.

19      Bowen, 885 F.2d 597, 604 (9th Cir.1989). The ALJ is not required
    to accept the opinion of a treating or examining physician if that

20      opinion is brief, conclusory and inadequately supported by clinical
    findings. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.2002).

21

22  Morehead v. Astrue, 2008 WL 3891464, *5 (E.D. Wash. 2008).

23       In this case, plaintiff's credibility was discounted by the ALJ and is at issue here;

24  for this additional reason, the ALJ appropriately rejected portions of her treating physician's

25  opinions.  It is reasonable to assume that Dr. Sheikh's records were based on plaintiff's

26  subjective complaints.

Plaintiff contends that contrary to what the ALJ represented, Dr. Sheikh did not think that some of plaintiff's weakness might be transient.  (Pl.'s Mot. at 28; id. at 34.)  Dr. Sheikh was referring to a TIA or transient ischemic attack, which is similar to a stroke but has only temporary symptoms.  "The short duration of these symptoms and lack of permanent brain injury is the main difference between TIA and stroke."  www.americanheart.org.  Based on this information, it was reasonable for the ALJ to construe Dr. Sheikh's opinion to be that some of plaintiff's weakness might be transient.

It is true that an ALJ may not rely solely on the non-examining opinion of state agency doctors, but it does not appear that he has done so.  Although the ALJ is permitted to rely on the opinions of non-examining professionals, he may do so only where he gives specific and legitimate reasons that are supported by an "abundance of evidence."  Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995).  Such evidence might include laboratory test results, contrary reports from examining physicians, plaintiff's testimony which conflicts with a treating physician, higher expertise of non-examining medical advisor, and suspect nature of examining physicians' test results.  Id., citing Andrews, 53 F.3d at 1043.  Further, in Magallanes, 881 F.3d at 753(emphasis added), the court held that where the conflicting non-treating opinion is based on independent objective findings, it could constitute substantial evidence.  Most recently, the Ninth Circuit restricted the ALJ further by holding that the opinion of a non-treating physician, when based on the same evidence relied on by the treating physician, but supporting a different conclusion from the treating source, would not be considered substantial evidence.  Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007).

Here, the ALJ did rely on the opinion of the DDS non-examining physician who found that plaintiff could do light work, and also noted that the severity or duration of the symptoms were out of proportion to the expected severity or duration.  (Tr. at 737.)  Pursuant to Orn, this opinion cannot alone be considered substantial evidence.

\\\\\

Nevertheless, the ALJ also relied on other physicians such as Dr. Jone, who treated plaintiff between 2001 and 2006. He diagnosed low back pain on November 13, 2002, and lumbar strain on May 23, 2003 and April 26, 2004.[9] (Id. at 677, 833, 984.) Despite these diagnoses every year, there does not appear to be any radiological study done of the lumbar spine.[10] Nor was any physical therapy, cortisone injections, surgery or other treatment ordered or recommended for the *lumbar* spine at any of these visits.

Dr. Sheikh's visits with plaintiff were usually focused on her other ailments. Her lower back pain was a subsidiary issue for which he did not separately recommend treatment. He did at first note on January 6, 2006, that he would obtain "authorization for neuromuscular electrical stimulation as well as neuromuscular re-education treatments for neck and back;" however, on several visits, including March 7, April 24, and May 5, 2006, he prescribed heat and ice as well as medication, but it was for plaintiff's carpal tunnel syndrome, not for her back. As almost an afterthought, he noted, "possible left L5-S1 radiculopathy." He did note that plaintiff was continuing "[physical] therapy" and that by May, 2006 it was helping. (Tr. at 1364, 1357, 1359, 1355, 1354.) It does not appear that this physical therapy lasted a significant length of time. Most of the treatment and medication to which plaintiff refers were prescribed for plaintiff's carpal tunnel syndrome and her cervical pain, not for her lower back. These other conditions do not affect her ability to stand and walk.

The ALJ may have found Dr. Sheikh's medical source statement to be inconsistent with the aforementioned records because he assessed plaintiff's primary diagnosis as

---

[9] Although plaintiff was diagnosed with a herniated disc in the cervical area and was recommended physical therapy for this problem, it does not affect plaintiff's ability to stand and walk. (Tr. at 680.)

[10] The studies to which the ALJ refers concern the cervical spine and it only revealed mild disc space narrowing at C5-6 and C6-7 on April 6, 2004, and a normal cervical spine with no narrowing on March 5, 2005. (Tr. at 979, 1519.) An MRI of the cervical spine on June 14, 2005, was normal with no herniation or stenosis. (Id. at 1262.) There was only minimal posterior bulging at C5-6. (Id. at 1261.)

16

lumbar and cervical radiculopathy. (Tr. at 1471.) Dr. Sheikh's records may have focused on her cervical ailments but did not focus on her lumbar spine. In regard the lumbar spine, Dr. Sheik's treatment notes consistently state only "possible" radiculopathy. His limitations to walking and standing only one hour at a time and two to three hours total do not comport with a diagnosis of *possible* radiculopathy.

To the extent that the ALJ may have relied on the non-examining DDS doctor, any error was harmless based on the alternative finding that incorporated Dr. Sheikh's limitations. An error which has no effect on the ultimate decision is harmless. Curry v. Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

In regard to Dr. Marino, the ALJ found that despite this treating allergist's mild findings, he assessed severe limitations in functioning. The ALJ fully summarized this physician's records which revealed treatment since 2000 for allergies and asthma. (Tr. at 32.) Dr. Marino noted that plaintiff put forth poor effort on examination and pulmonary function tests, and despite her alleged shortness of breath, her lungs were almost always clear. Only rarely did he note mild wheezing. He thought that there might be a functional or psychological component to plaintiff's shortness of breath. Even when plaintiff went to the emergency room for shortness of breath, her lungs were found to be clear. (Id.)

The ALJ found Dr. Marino's medical source statement out of proportion to these findings. This statement, dated June 9, 2006, assessed "recurrent wheezing" in contrast to notes of rare and mild wheezing in his treatment records.[11] (Id., 1311.) He thought plaintiff should be limited to sitting only thirty minutes before she would need to get up, and could stand for only thirty minutes at a time. The ALJ also noted Dr. Marino's opinion that plaintiff would need to take five unscheduled breaks during a work day for twenty minutes each. (Id. at 1313.) Plaintiff would need to miss more than four days of work per month based on her condition, and was to

---

[11] For several visits prior to Dr. Marino's medical source statement, he had found plaintiff's spirometry values to be stable and chest clear. (Tr. at 1316, 1318, 1369, 1378, 1384.)

avoid all exposure to environmental irritants, humidity and extreme heat and cold.  (Id. at 1314.)

The ALJ was entitled to reject Dr. Marino's medical source statement and rely on his treatment records[12] which indicate that although plaintiff's spirometry values were low at 83% of normal on April 29, 2003, it was possibly because of poor effort.  (Id. at 644, 617.)  At this time, plaintiff's chest was clear, and she had no breathing complaints.  (Id. at 617.)  This allergist also stated, "[i]t is unusual for patients who have ongoing chronic asthma to have reversal within 24 hours to normal values on their spirometry and I wonder whether there is a psychogenic overlay and whether Regina's dyspnea is asthma or only partly asthma."  (Id.)  Although plaintiff correctly notes that the spirometry values were on average 85% of normal, (id. at 644-46, 807-08), Dr. Marino's comments must be considered.  Defendant is also correct in pointing out that plaintiff's chest was clear on 23 out of 24 different visits over a nine month period in 2002 to 2003, with similar numerous notations more recently in 2005 and 2006.  (Id. at 617-43, 1369-1410.)

The ALJ relied in part on Dr. Hayat's opinion of mild combined obstructive and restrictive lung disease.  He too thought there was a functional or psychological component to plaintiff's shortness of breath.  (Id. at 32, 692.)  The ALJ pointed out Dr. Hayat's comment in October, 2005, that plaintiff's breathing was stable for the past year and she was doing very well at that time and into April, 2006.  The ALJ noted in regard to both Drs. Marino and Hyatt, that plaintiff's lungs were clear, and even when she discontinued Prednisone, she did not have asthma attacks or shortness of breath.  (Id.)

Earlier records from December, 2002 diagnosed mild combined obstructive and restrictive lung disease; however, plaintiff experienced dyspnea only after severe exertion, and wheezing was rare.  (Tr. at 703, 695.)  On December 20, 2002, a CT scan of the lungs indicated no interstitial lung disease.  (Id. at 697.)  On December 30, 2002 pulmonary function test

---

[12]  It was permissible for the ALJ to rely on only selected portions of Dr. Marino's opinion while rejecting other parts.  See, e.g., Magallanes, 881 F.2d at 753.

indicated normal air flow and lung volume. There was a severe decrease in diffusion capacity. (Id. at 694.)

On January 24, 2003, plaintiff saw Dr. Hayat after she had been to the emergency room for shortness of breath, following her termination of steroids thirteen days earlier. The hospital found no wheezing and she was sent home. (Tr. at 691.) Upon seeing Dr. Hayat, he informed her that her condition was normal and that "she can get over this problem without significant difficulty and that there is no reason for her to be so short of breath without any logical explanation." (Id. at 692.) On January 3, 2003, a pulmonary perfusion study was done, indicating "normal ventilation and perfusion scan without evidence for segmental or subsegmental defects. There is no qualitative difference between the right and the left lungs on perfusion or ventilation imaging." (Id. at 693.)

The ALJ properly took into account plaintiff's respiratory condition in both of his hypotheticals to the vocational expert which excluded work involving dust, fumes, gases, and poor ventilation. (Tr. at 1632, 1634.)

That court finds that substantial evidence supports the ALJ's partial rejection of the opinions of Drs. Sheikh and Marino.

C. The ALJ's Credibility Findings

Plaintiff next claims that the ALJ failed to credit plaintiff's testimony regarding her functional limitations and pain.

The ALJ determines whether a disability applicant is credible, and the court defers to the ALJ who used the proper process and provided proper reasons. See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). If credibility is critical, the ALJ must make an explicit credibility finding. Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief").

\\\\\\

In evaluating whether subjective complaints are credible, the ALJ should first consider objective medical evidence and then consider other factors. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. July 8, 2009); Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991) (en banc). The ALJ may not find subjective complaints incredible solely because objective medical evidence does not quantify them. Bunnell at 345-46. If the record contains objective medical evidence of an impairment reasonably expected to cause pain, the ALJ then considers the nature of the alleged symptoms, including aggravating factors, medication, treatment, and functional restrictions. See Vasquez, 572 F.3d at 591. The ALJ also may consider the applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) daily activities.[13] Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13. Work records, physician and third party testimony about nature, severity, and effect of symptoms, and inconsistencies between testimony and conduct, may also be relevant. Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for medical diagnosis. Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990). Plaintiff is required to show only that her impairment "could reasonably have caused some degree of the symptom." Vasquez, 572 F.3d at 591, quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007), Smolen, 80 F.3d at 1282. Absent affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony must be specific, clear and convincing. Vasquez, 572 F.3d at 591.

\\\\\

---

[13] Daily activities which consume a substantial part of an applicants day are relevant. "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (quotation and citation omitted).

Here, the ALJ found that plaintiff's description of the intensity, persistence and limiting effects of her symptoms was not entirely credible based on treatment records indicating stable condition, limited clinical findings and conservative treatment. He discussed Dr. Marino's treatment which, although noting plaintiff's complaints of shortness of breath, consistently found clear lungs and rarely found only mild wheezing. The ALJ also stated that although plaintiff's spirometry readings were low, they were stable. (Tr. at 32.)

The ALJ summarized plaintiff's visits to both treating physicians and emphasized that plaintiff often reported no asthma attacks or shortness of breath, even when she was not taking Prednisone. (Id.) The ALJ cited numerous treating records which indicated plaintiff's respiratory condition was stable over the past year. The ALJ also rejected Dr. Marino's more severe findings in his medical source statement based on the aforementioned inconsistencies in the treatment records. He also only partially credited Dr. Sheikh's opinion regarding plaintiff's functional capacity as inconsistent with the level of treatment he provided. See discussion supra.

The ALJ then spent two to three more pages discussing plaintiff's other ailments, showing why the treatment records and clinical findings were not consistent with her complaints. For example, although Dr. Jone's treatment notes indicated a herniated cervical disk, a CT scan of the cervical spine was normal. (Id. at 32-33.) There was no further mention of this until two years later, after a motor vehicle accident when x-rays indicated only some disc space narrowing. Plaintiff also complained of right arm, hip and leg pain after being hit by a car in March, 2005; however, x-rays were normal and the only treatment provided was IV pain medication. (Id. at 33.) Although plaintiff complained of left sided weakness on one emergency room visit, MRIs of the cervical spine and brain were normal.

Further, the ALJ found that plaintiff's carpal tunnel syndrome was not as severe as Dr. Sheikh described, based on his treating records. For example, plaintiff was prescribed wrist braces only. Surgery was not recommended. No manipulative limitations were assessed. (Id. at 34.)

In regard to her radiculopathy, the ALJ noted that plaintiff was not referred to a neurosurgeon or orthopedist. Plaintiff received only a short period of physical therapy, and surgery was not recommended. Nor was plaintiff referred to a pain clinic. (Id.)

With respect to plaintiff's mental impairments, the ALJ took note of Dr. Miller's psychological testing, from which he concluded that although test results indicated possible brain damage, the fact that plaintiff had worked afterward indicated that she could still do some work. (Id. at 34.) Dr. Miller had found that testing put plaintiff in the mild mentally retarded range, which was inconsistent with her schooling and past work history, but might be explained by brain damage. (Id. at 1453.) The ALJ also noted that plaintiff's mental state was stable unless she stopped taking her medication. (Id. at 35.) The record shows that treatment providers continually encouraged adherence to medication prescriptions. (Id. at 875, 1287, 1292.) A condition which can be controlled or corrected by medication is not disabling. See Montijo v. Secretary of HHS, 729 F.2d 599, 600 (9th Cir.1984) (Addison's Disease controlled with medications deemed not disabling); Odle v. Heckler, 707 F.2d 439, 440 (9th Cir.1983) (rib condition controlled with antibiotics not considered disabling).

The ALJ also summarized plaintiff's daily activities which included cooking when she feels well, taking her son to school, doing some household chores when she can, cleaning the bathroom, making the bed, doing laundry, grocery shopping once a month, sometimes with family's help, taking a walk in the park, reading and watching television. (Tr. at 30, 564-65.) She leaves her house every day, either by walking or driving a car, and usually goes to the doctor, store or church. (Id. at 566.) Plaintiff testified that she did not do certain household chores but had a chore worker supplied by Sacramento County for the past year who came to her house. Plaintiff continued to go out to eat, walk for exercise, and occasionally attend her son's sporting event. (Id. at 31, 1599[14].)

---

[14] Plaintiff also testified that her son had his own separate chore worker. (Id.)

Plaintiff contends that three physicians thought plaintiff was not malingering. That may be true; however, Dr. Marino opined that plaintiff put forth a poor effort and thought there might be a psychological component to her shortness of breath because it is quite unusual for a patient with ongoing chronic asthma to experience a reversal of her spirometry values within 24 hours. He was not sure she had asthma. (Tr. at 617, 620, 832, 834.) The ALJ took note of these comments in discussing her credibility. (Id. at 32.) The ALJ also described Dr. Hayat's belief that there was a psychological component to plaintiff's shortness of breath. (Id.; id. at 692.)

Dr. Marino also questioned plaintiff's complaint of itching, hives, and trouble breathing on one occasion. He wondered whether she was having a true allergic reaction to an allergy injection or whether the cause was stress. (Id. at 1384.) Dr. Hayat separately questioned plaintiff's complaints of shortness of breath, stating that there was no logical explanation for it and telling her that she could get over this problem without significant difficulty. (Id. at 692.)

The court finds that the ALJ thoroughly analyzed plaintiff's credibility and his findings are supported by substantial evidence.

D. Whether the ALJ Failed to Properly Assess Plaintiff's RFC and as a Result Failed to Properly Question the Vocational Expert

Plaintiff first asserts that the ALJ failed to include the limitations imposed by Drs. Sheikh and Marino in his hypothetical to the vocational expert. Nor did he include Dr. Walter's "marked limitations in concentration, persistence and pace," although he gave great weight to this testifying expert. Plaintiff's second claim is that the ALJ failed to inquire into any conflicts between the occupational evidence provided by the VE and the Dictionary of Occupational Titles.

Hypothetical questions posed to a vocational expert must include all the substantial, supported physical and mental functional limitations of the particular claimant. Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir.1995); see Light v. Social Sec. Admin., 119 F.3d

23

789, 793 (9th Cir.1997).  If a hypothetical does not reflect all the functional limitations, the expert's testimony as to available jobs in the national economy has no evidentiary value.  DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  But see Thomas v. Barnhart, 278 F.3d 947 (9th Cir. 2002) (approving hypothetical directing VE to credit specific testimony which VE had just heard); Matthews v. Shalala, 10 F.3d 678 (9th Cir. 1993) (failing to include all limitations in a hypothetical may be harmless error if the ALJ's conclusions are supported by other reliable evidence).  While the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, substantial evidence must support the hypothetical which ultimately serves as the basis for the ALJ's determination.  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).[15]

The ALJ's decision not to include the extreme limitations of Drs. Sheikh and Marino, that plaintiff could not work an eight hour day, five days a week, due to pain, or that plaintiff would miss more than four days of work per month, was already discussed and found to be proper.  See discussion Section B supra.

Although Dr. Walter did find marked limitations in intellectual functioning, he found that this would limit plaintiff to simple tasks and that she would not be able to work as part of a team.  (Tr. at 1620-21.)  The ALJ did include both of these limitations in his hypotheticals to the expert.  (Tr. at 1632, 1634.)

Plaintiff's own testimony regarding her physical limitations and pain were correctly discounted by the ALJ.  See discussion Section C supra.

\\\\\

\\\\\

\\\\\

---

[15]  Similarly, "[t]he ALJ is not bound to accept as true the restrictions presented in a hypothetical question propounded by a claimant's counsel."  Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  The ALJ is free to accept them if they are supported by substantial evidence or reject them if they are not.  Id. at 756-757.

There do appear to be some inconsistencies between the vocational expert's testimony and the DOT. In regard to plaintiff's claim regarding the SVP,[16] reasoning and math levels of the jobs designated by the expert, it does appear that the VE testified that the jobs of theater usher, office clerk and information clerk[17] had SVPs of 2 and were consistent with the DOT.[18] Plaintiff contends that the DOT lists the SVP for office clerk at 3, reasoning level at 3, math level at 2, and language level at 3. She contends that the DOT lists the SVP for information clerk at 4, reasoning level at 4, math level at 2, and language level at 3.

SSR 00-4p requires the ALJ to elicit a reasonable explanation for the conflict before relying on the VE's testimony. Here, the ALJ did not ask the expert whether her testimony conflicted with the DOT and why. (Id. at 1634-35.) He furthermore found that her testimony was consistent with the DOT. (Id. at 37.) The ALJ committed error in this regard.

This error was harmless with respect to the SVP levels as the expert's testimony was consistent with the DOT. It appears that plaintiff has mistakenly reviewed two of the wrong jobs. She refers to DICOT 209.562-010 for office clerk where the vocational expert specifically identified DICOT 239.567-010 for officer helper. She also refers to DICOT 237.367-022 for information clerk where the expert had identified DICOT 237.367-018 for this job. The jobs

---

[16] SVP (specific vocational preparation) levels should not be confused with reasoning levels as these are two separate vocational considerations. SVP levels do not address whether a job involves only simple or less than complex tasks. Meissl v. Barnhart, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005).

[17] These jobs were responsive to the first hypothetical, the one primarily relied on by the ALJ.

[18] The United States Dept. of Labor, Employment & Training Admin., Dictionary of Occupational Titles (4th ed. 1991), ("DOT") is routinely relied on by the SSA "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy." Terry v. Sullivan, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements. It is used by the SSA to classify jobs as skilled, unskilled, or semiskilled. (Id.) Each job is assigned a number reflecting how long it generally takes to learn the job, termed "specific vocational preparation" ("SVP") time. (Id.) The DOT is a primary source of reliable job information for the Commissioner. 20 C.F.R. § 404.1566(d)(1).

25

relating to the first hypothetical upon which the ALJ relied based on the DOT numbers provided by the VE, contain the following requirements according to the DOT: theater usher has an SVP level of 2, a reasoning level of 2, a math level of 1, and a language level of 1.  DICOT 344.677-014.  Office helper contains an SVP level of 2, reasoning level of 2, math level of 2, and language level of 2.  DICOT 239.567-010.  Information clerk contains an SVP level of 2, reasoning level of 4, math level of 2 and language level of 3.  DICOT 237.367-018.

The jobs assigned by the vocational expert in response to the second hypothetical which is based on Dr. Sheikh's restrictions and was used as an alternative finding by the ALJ are charge account clerk, SVP level 2, reasoning level 3, math level 2, and language level 3; telephone clerk, SVP level 2, reasoning level 3, math level 2, and language level 3; and lamp shade assembler, SVP level 2, reasoning level 2, math level 1, and language level 1.  DICOT 205.367-014, 237.367-046, 739.684-094.

As all the SVP levels of all jobs responsive to both the primary and alternative hypothetical are level 2, the same as testified to by the vocational expert, there was no error in this regard.  The ALJ was not required to delve further into this area.

There were, however, conflicts between some of the reasoning, math and language levels of these jobs in the DOT and the expert's testimony based on the ALJ's hypotheticals.  The ALJ did not question the expert about these levels, but plaintiff's attorney did.  He asked: "[w]hat are the reading and writing requirements and math requirement for the jobs you've identified per the DOT?"  (Id. at 1638.)  The expert responded that all levels were low because these jobs are the "lowest unskilled jobs."  (Id. at 1639.)  Plaintiff's attorney then asked the expert about the reasoning, math and language levels.  The expert took one job, usher, as an example, and explained all of these levels and what they required.  (Id. at 1639-40.)  After more questioning, the attorney asked the expert the following:

> Q According to the DOT if she can't perform to the level of the
> DOT identifying math, reasoning and language[] then according to
> the DOT she cannot perform those jobs you identified.  Is that

1  correct?
       A  No, because not everyone that performs these jobs can perform
2      at the level that the DOT has identified.

3  (Id. at 1640.)  The VE then reiterated that there are people in the work force doing these jobs who

4  cannot perform at the levels described in the DOT.  (Id. at 1641.)

5         This colloquy satisfies the requirement that the ALJ must obtain an explanation

6  for the conflict between the DOT and the VE's testimony.

7         Plaintiff next contends that the jobs provided by the vocational expert require a

8  reasoning level of 2 or more, and therefore plaintiff cannot do them because she is limited to

9  simple unskilled work and a reasoning level of 2 requires the ability to "apply commonsense

10  understanding to carry out detailed but uninvolved written or oral instructions."  See e.g. DICOT

11  344.677-014.

12         Here, the limitation to simple tasks must be reconciled with the various reasoning

13  levels of the jobs assigned by the vocational expert.  Rather than adhere to a strict construction of

14  what this limitation equates to in terms of reasoning level, this court prefers to follow the well

15  developed reasoning of the Central District in Meissl.  There, the plaintiff was found to be

16  limited to "simple tasks performed at a routine or repetitive pace."  Id. at 982.  The court

17  explained that although the Social Security Regulations contained only two categories of abilities

18  in regard to understanding and remembering instructions, either "short and simple" and

19  "detailed" or "complex,' the DOT had many more gradations for measuring this ability, and there

20  were six gradations altogether.  Id. at 984.  For example, level 2 requires application of

21  "commonsense understanding to carry out detailed but uninvolved written or oral instructions.

22  Deal with problems involving a few concrete variables in or from standardized situations."

23  DICOT, App. C.  The court continued:

24         To equate the Social Security regulations use of the term "simple"
       with its use in the DOT would necessarily mean that all jobs with a
25      reasoning level of two or higher are encapsulated within the
       regulations' use of the word "detail."  Such a "blunderbuss"
26      approach is not in keeping with the finely calibrated nature in

1    which the DOT measures a job's simplicity.

2  Meissl, 403 F. Supp.2d at 984.

3    Furthermore, the use of the term "uninvolved" along with the term "detailed" in

4  the DOT qualifies it and refutes any attempt to equate the Social Security regulations' use of the

5  term "detailed" with the DOT's use of that term.  Id.  The court found that the plaintiff's RFC

6  must be compared with the DOT's reasoning scale.  A reasoning level of one requires slightly

7  less than simple tasks that are in some sense repetitive.  For example, they include the job of

8  counting cows as they come off a truck.  A reasoning level of two would encompass an RFC of

9  being able to do "simple and routine work tasks."  Id.

10    This court finds that plaintiff could not do the jobs of charge account clerk, phone

11  clerk, or information clerk, as all of those jobs require a reasoning level of 3 or 4.  Plaintiff has

12  been limited to simple tasks by Dr. Walter and Dr. Nakagawa.  (Tr. at 1621, 990.)

13    The only question remaining is whether the three remaining jobs containing a

14  reasoning level of 2 (theater usher, officer helper, sedentary assembler) exist in significant

15  numbers in the economy.  A claimant is not disabled if, considering her age, education, and work

16  experience, she can engage in any other kind of substantial gainful work which exists in

17  significant numbers in the national economy, regardless of whether such work exists in the

18  immediate area in which she lives.  See Barker v. Secretary of Health and Human Serv., 882 F.2d

19  1474, 1478 (9th Cir.1989) (citing 42 U.S.C. §  423(d)(2)(A) (1982 & Supp.1987)).  Further,

20  "[w]hether there are a significant number of jobs a claimant is able to perform with her

21  limitations is a question of fact to be determined by a judicial officer."  Martinez v. Heckler, 807

22  F.2d 771, 775 (9th Cir.1986).  Moreover, the issue is whether there are jobs that a claimant could

23  perform, not whether there are any openings at such positions.  20 C.F.R. §§ 404.1566(a),

24  416.966(a); Torske v. Richardson, 484 F.2d 59, 60 (9th Cir.1973) ("the relevant inquiry is not

25  whether the claimant is able to obtain employment at some substantial activity that exists in the

26  national economy but whether the claimant is able to engage in such activity").  The Ninth

Circuit has not determined what number of jobs meet the "significant number" requirement. Barker, 882 F.2d at 1478-79 (finding that the regulations discuss numbers of jobs, not percentage). Significant numbers must be more than two isolated jobs, but are not determined by a ratio to population in the area. Martinez, 807 F.2d at 775; Barker, 882 F.2d at 1478-79.

The VE testified that there are 5,000 sedentary assembler jobs in California and 56,000 in the nation. (Id. at 1634.) There are 6,700 theater usher jobs in California and 57,000 in the nation. (Id. at 1633.) There are 20,000 office helper jobs in California and 156,000 nationally. (Id. at 1633-34.) These numbers indicate that a significant number of jobs exist in the national economy.[19] See Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995) (2,300 jobs in the county and 64,000 nationwide are sufficient); Barker v. Secretary HHS, 882 F.2d 1474, 1478-79 (9th Cir. 1989) (1,200 jobs in Southern California are sufficient).[20]

Therefore, substantial evidence supported the ALJ's finding that plaintiff is not disabled.

CONCLUSION

Accordingly, IT IS ORDERED that plaintiff's Motion for Summary Judgment is denied, the Commissioner's Cross Motion for Summary Judgment is granted, and judgment is entered for the Commissioner.

DATED: 03/15/2010               /s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH/076
Lawson2008.ss.wpd

---

[19] Plaintiff points out the math level of these jobs, but does not argue that plaintiff is not capable of performing at math level 1 or 2. In any event, even if the job of officer helper is eliminated because it requires level 2 math, the remaining jobs of theater usher and sedentary assembler exist in significant numbers.

[20] The ALJ is not required to obtain testimony of significant numbers of jobs in plaintiff's local area. 20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1) (2008) (it does not matter whether work exists in immediate area where plaintiff lives).